UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOEL D. CLENDENING, | JUDGE CHRISTOPHER A. BOYKO |
| Plaintiff, | CASE NO. 5:09CV2111 |
| -vs- | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ORDER |
| Defendant. | |

CHRISTOPHER A. BOYKO, J.

This matter comes before the Court upon Plaintiff's Objection to the Report and Recommended Decision (ECF DKT #29) of the Magistrate Judge, recommending that Defendant's final decision denying Plaintiff's claim for disability benefits be affirmed. For the following reasons, the Court ADOPTS the Magistrate Judge's Report and Recommendation.

BACKGROUND

On March 21, 2006, Plaintiff, Joel Clendening ("Clendening") applied for Disability Insurance Benefits ("DIB") under 42 U.S.C.§§ 1382(a)(3)(A),(B) alleging a disability since June 2, 1993. The Administrative Law Judge ("ALJ") held a hearing on May 16, 2008, after which, on June 13, 2008, the ALJ issued his decision determining that Clendening was not disabled.

Clendening was 44 years of age at the time of his agency hearing, and had not worked since June 2, 1993, when he retired as the director of worldwide marketing for Diebold corporation.

*(Medical Evidence Prior to March 31, 1999 Date Last Insured)*

In August 1993, Raymond Erickson, M.D. diagnosed Clendening with a torn

medial meniscus in his right knee, although otherwise "in excellent health."  Dr. Erickson performed arthroscopic surgery - a partial medial meniscectomy.  At a follow-up visit, Dr. Erickson noted Clendening was doing well.

On February 6, 1997, Clendening went to Dr. Erickson with a knee injury after he "tripped" and fell while skiing a week earlier. Dr. Erickson diagnosed an acute left knee ligamentous injury with anterior cruciate ligament and medial collateral ligament disruption.  On February 7, 1997, Dr. Erickson performed successful arthroscopic surgery and Clendening was released on crutches.

By March 21, 1997, Dr. Erickson noted that Clendening's wound had healed and he participated in physical therapy.  Dr. Erickson opined Clendening was "OK to play golf," although his knee cap would "get sore if he works out with weights too soon."

A follow-up visit, on August 18, 1997, with Dr. Erickson noted Clendening was "doing nicely," but had a "slightly limited" range of motion.  Dr. Erickson noted Clendening reported "doing fine" with "no problems."  (Tr. 158).  Clendening was still attending physical therapy and Dr. Erickson recommended Clendening use a brace for skiing.  (Tr. 158).

*(Medical Evidence After the March 31, 1999 Date Last Insured)*

On November 6, 2000, Clendening struck his elbow while working around is house, developing a tender olecron bursa which Dennis Glazer, M.D., excised.  Clendening told Dr. Glazer that his health was otherwise good.  (Tr. 218). On December 12, 2000, Clendening was invited on a golf outing and asked Dr. Glazer whether he could go.  (Tr. 225).  Dr. Glazer indicated that the golf outing "should be OK."  (Tr. 225).  On December 13, 2000, Clendening told Dr. Glazer his hand was sore from two days of pressure washing.  (Tr. 223).

On May 28, 2003, Clendening reported having a pain between his shoulder blades "for about two weeks."  (Tr. 221).  Clendening had normal range of motion and normal strength, but Dr. Glazer observed an osteophyte formation and narrowing on his x-rays, suspected cervical radiculopathy and recommended physical therapy.  (Tr. 220-21).  A June 20, 2003 MRI showed multi-level degenerative disk disease within the cervical spine with canal stenosis.  (Tr. 215-16).

On June 25, 2003, Clendening was seen by neurosurgeon Kamel Muakkassa, on a referral from Dr. Glazer, who noted that Clendening reported he had been dropping objects and "having poor control of his golf club."  (Tr. 213).  Dr. Muakkassa noted Clendening had received minimal improvement with physical therapy and recommended a decompression with an anterior fusion.  Clendening successfully underwent the fusion procedure on July 3, 2003.  (Tr. 214).  On July 24, 2003, Dr. Muakkassa noted Clendening's wound had healed very well and Clendening was happy with the results and "definitely improved."  (Tr. 212).  However, on November 11, 2003, Clendening

reported tingling.  A cervical MRI showed a small myelomalacia in his cord disc degeneration, which was a "new development for him."  (Tr. 211).

On January 13, 2004, neurologist Leon Rosenberg, M.D. saw Clendening on a referral from Clendening's wife, Marilyn Clendening, who is a physician.  (Tr. 238-39).  Clendening reported a number of "medical issues that started in approximately May 2003" that "would be consistent with Parkinson's disease."  (Tr. 238-39).  On February 23, 2004, Dr. Rosenberg reviewed Clendening's EMG studies and confirmed that he had Parkinson's disease, but he "appear[ed] to be fully functional at this point." (Tr. 236).   Dr. Rosenberg recommended continuing to treat Clendening with medication and physical therapy. (Tr. 236).

On September 13, 2004, Dr. Muakkassa wrote a "To Whom It May Concern" letter ("TWIMC"), indicating that Clendening had a "serious medical condition involving cervical myelopathy as well as Parkinson's disease." (Tr. 229).

On July 18, 2006, Dr. Rosenberg wrote a TWIMC letter indicating Clendening was diagnosed with Parkinson's disease compounded by severe cervical spinal stenosis status post cervical decompression. (Tr. 235).  Dr. Rosenberg stated Clendening was "permanently and totally disabled secondary to the combination of difficulties resulting in severe upper extremity dysfunction and gait disturbance." (Tr. 235).

On September 22, 2006, Dr. Muakkassa wrote a TWIMC letter stating Clendening had severe cervical spondylosis and degenerative disk disease as of 2003.  (Tr. 240).  Dr. Muakkassa noted this was a progressive disease, and indicated Clendening "must have started his problems of the cervical spine between 10 to 15 years prior to 2003," perhaps "in the early 1990's."  (Tr. 240).  Dr. Muakkassa thought Clendening was "permanently and totally disabled."  (Tr. 240).

On October 5, 2006, Dr. Rosenberg wrote a TWIMC letter stating Clendening had been "disabled as a result of a number of cervical surgeries and Parkinson's disease back to 1990," with "persistent pain and functional decline particularly since 1993."  (Tr. 234).  Dr. Rosenberg felt there was no question that he has been "totally disabled since at least 1993, and partially disabled since 1990." (Tr. 234).

*Administrative Hearing*

On May 1, 2008, Clendening appeared with counsel for a hearing before the ALJ for a determination of whether Clendening was disabled prior to the date of the expiration of his insured status on March 31, 1999.  Clendening's counsel stated that Clendening's primary physician since 1993 had been his wife.  Unfortunately, due to their divorce, he and his wife did not speak.  Further, Dr. Clendening's divorce attorney stated Marilyn Clendening had no treatment records.  (Tr. 24).

Clendening was 44 years old. He completed high school and took a few college courses.

Clendening testified his last job, prior to 1993, was as director of worldwide marketing for Diebold, paying approximately $100,000 a year. Clendening carried a briefcase for business travel and had an assistant to carry other items. Clendening did not regularly lift more than 10 pounds and was usually seated while performing his job.

Clendening testified that by June 1993, it became "very difficult to function," as he developed pain and tremors in approximately 1990 which, by 1993, were as bad as they were at the time of hearing. (Tr. 26-27). Clendening also stated that his pain became more severe from 1993 through 1999; and neither his 2003 neck surgery nor his knee surgeries helped his pain. (Tr. 27-28). Clendening reported having memory problems in 1993, followed by depression but did not seek any treatment. (Tr. 40).

Vocational Expert, ("VE") Ted Macy testified that Clendening's past work was a sedentary but highly skilled job and, at times, such jobs could be performed at the light level. (Tr. 41-42). The ALJ asked a hypothetical concerning a person with Clendening's age, experience and background, who could perform light work, lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; standing, walking and sitting for 6 hours in an 8-hour workday; pushing and pulling up to 20 pounds occasionally and 10 pounds frequently; occasionally climbing ramps and stairs, kneeling, crouching and crawling; but not climbing ladders or scaffolds. (Tr. 42). The VE testified such an individual could perform Clendening's past work. The ALJ then asked whether this hypothetical individual could perform Clendening's past work if he needed to be off task 20 percent of the time. The VE noted that, for highly skilled jobs, there is sometimes an ability to make up for off task time later, but as a realistic matter, such an individual could not perform Clendening's past, or any other, work.

## LAW AND ANALYSIS

### *Standard of Review*

Under Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636, the District Court is required to review *de novo* any portion of the Magistrate Judge's Report to which a specific objection is made. A party who fails to file an objection waives the right to appeal. *U.S. v Walters*, 638 F.2nd 947, 950 (6th Cir. 1981). In *Thomas v Arn*, 474 U.S. 140, 150(1985), the Supreme Court held: "It does not appear that Congress intended to require a district court review of a magistrate judge's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."

Local Rule 72.3(b) recites in pertinent part:

The District Judge to whom the case was assigned shall make a *de novo*

> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge.  The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record.  The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

The findings of the ALJ in a Social Security hearing are conclusive, if supported by substantial evidence.  See *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept [as adequate to support a conclusion]."  *Id.*; *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  The Sixth Circuit has also held that "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Thus, the ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Foster*, 279 F.3d at 353.  The Court will therefore "not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

<u>ALJ's Findings of Fact and Conclusions of Law</u>
On June 13, 2008, the ALJ found Plaintiff was not disabled.  This decision stands as Defendant's final determination due to denial of review by the Appeals Council on January 10, 2009.  The AlJ's Findings of Fact and Conclusions of Law were:

> 1.  The claimant met the insured status requirements of the Social Security Act through March 31, 1999.
> 2.  The claimant has not engaged in substantial gainful activity since June 2, 1993, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).
> 3.  Through March 31, 1999, when the claimant's disability insured status expired, the claimant had the following severe impairments: status post arthroscopy and partial medial meniscectomy of the right knee due to torn medial meniscus in September 1993 and status post arthroscopy, partial medial meniscectomy of the left knee, with arthroscopically assisted reconstruction of anterior cruciate ligament in February 1997 due to an acute ligamentous injury of the left knee (20 CFR 404.1520(c)).
> 4.  Through March 31, 1999, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR

> 404.1520(d), 404.1525 and 404.1526).
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work which involves lifting and carrying up to 20 pounds occasionally, 10 pounds, frequently, sitting, standing and walking for six hours each in an eight hour day, no climbing of ladders, ropes and scaffolds, occasional climbing of ramps and stairs, and occasional kneeling, crouching, and crawling. 20 CFR 404.1567(b).
> 6. The claimant is capable of performing his past relevant work as a director of marketing. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565).

Plaintiff's Objections

Plaintiff argues that the ALJ erred in not calling a medical expert to establish an onset date for Clendening's impairment, pursuant to SSR 83-20. However, "[t]he only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). Having found that Clendening was not disabled prior to March 31, 1999, SSR 83-20 is not applicable. *Id.*

Plaintiff also complains that the ALJ failed to follow the "treating physician rule" when he discounted Clendening's treating physicians' retrospective opinions of disability. The opinion of a treating source should be given controlling weight if that opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence of record." 20 CFR 404.1527(d)(2), SSR 96-2p. Both Dr. Muakkassa and Dr. Rosenberg offered the opinion that Clendening was totally and permanently disabled, probably since the early 1990's. The ALJ was justified in rejecting these opinions since neither doctor had firsthand knowledge of Clendening's condition prior to the date last insured. Their opinions contradict the medical records from 1993 and 1997, which illustrated that Clendening was skiing, golfing, and working around his home and that he was otherwise in "fine" or "excellent" health. Furthermore, "the conclusion of disability is reserved to the Secretary," and "no 'special significance' will be given to opinions of disability, even if they come from a treating physician." *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). Unlike an assessment of particular functional limitations, an opinion that Plaintiff cannot work is entitled to no weight. *Id.* 20 CFR 404.1527(e)(3) (2006); SSR 96-5: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. 34471, 34473 (Soc. Sec. Admin. July 2, 1996).

Finally, Plaintiff objects to the ALJ's failure to properly assess Clendening's credibility. Clendening testified to hand tremors, trouble focusing, and pain down his spine, right arm and legs, beginning as early as 1989 or 1990. He testified to surgeries on his right and left knees prior to 1999, which did not alleviate his pain symptoms. These problems, according to Clendening, caused him to quit working. However, the ALJ noted substantial evidence in the record of Clendening's active lifestyle during the same crucial time period. He was skiing and golfing; and, in fact, one surgery was

necessary to correct an injury suffered after Clendening fell while skiing in 1997. The ALJ is afforded great deference in his credibility determinations, since he had the opportunity to personally observe the claimant and judge his demeanor while testifying. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007); *Jones*, 336 F.3d at 476 (6th Cir. 2003). In the instant case, the ALJ's discrediting of Clendening's subjective complaints was reasonable and supported by substantial evidence in the record.

## CONCLUSION

Based on the arguments, the record and the applicable law, the Court ADOPTS the Report and Recommendation of the Magistrate Judge affirming Defendant's decision to deny Joel D. Clendening's application for Social Security Disability Income Benefits.

IT IS SO ORDERED.

DATE: March 28, 2011

 S/Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge